# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

HENNESSEY COLON,

     Plaintiff,

v.                                          Case No. 8:24-cv-1504-WFJ-AEP

SOUTHEASTERN GROCERS, INC.,
d/b/a Winn-Dixie,

     Defendant.

_____/

## ORDER

Before the Court is Defendant Southeastern Grocers, Inc.'s ("Winn-Dixie") Motion for Summary Judgment (Dkt. 59) and Statement of Undisputed Facts (Dkt. 60), Plaintiff's responses to each (Dkts. 72, 73), and Defendant's Reply (Dkt. 74), together with numerous filings supporting and opposing same (Dkts. 48, 50–57, 62, 65–71). After careful consideration of the applicable law, the submissions of the parties, and the entire file, the Court concludes the motion is due to be granted.

## BACKGROUND

Plaintiff brings this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Florida Civil Rights Act, § 760.01 *et seq.* of the Florida Statutes ("FCRA"). The complaint alleges a sexually hostile work environment created by a co-worker in violation of both Title VII and the FCRA (Counts I and II), retaliation and constructive discharge under both Acts (Counts

III and IV), and negligent retention and supervision under Florida law (Counts V and VI). Defendant seeks summary judgment on all counts. Plaintiff concedes the evidence does not support Counts III, IV, V, and VI. Dkt. 72 at 1 n.1.

## FACTS

Plaintiff Hennessey Colon began working for Winn-Dixie as a part-time cashier at the Dundee store on December 24, 2021. Dkt. 60 ¶ 1.[1] Ms. Colon was 16 years old at the time. Ethan Green was 20, and the alleged harasser, and worked part-time bagging groceries and collecting shopping carts from the parking lot and pushing them back into the store.

## Green's conduct

Before reciting the incidents supporting the co-worker sexual harassment claims, the Court addresses the issue of Ethan Green's autism. According to some employees and his mother, Green has autism, with some describing it as Asperger's. Dkt. 52-3 at 3; Dkt. 55; Dkt. 52 at 15–16; Dkt. 65 at 11. Counsel for Plaintiff contends Green's mother's declaration is inadmissible because she was not timely disclosed as a witness. Dkt. 73 ¶¶ 8, 9. Defendant responds that the mother's declaration did not become necessary until summary judgment conferral when Plaintiff refused to stipulate that Green is autistic. *See* Dkt. 74-2. Ten

---

[1] Defendant's statement of undisputed facts at docket 60 will be cited where Plaintiff admits the fact in docket 73.

months prior to conferral, Plaintiff's counsel was provided information via Mr. Green's counsel purportedly establishing Green's diagnosis. *See* Dkt. 74-1 at 2, 5. The papers lent support that Green was diagnosed with autism at age 4 or 5. *Id.*; Dkt. 55. Green also sometimes stares prolongedly ("autistic gaze") and makes inappropriate facial expressions and statements out of context. Dkt. 55. After this information was provided, Plaintiff's counsel voluntarily dismissed Green from this action. Dkt. 17. For purposes of this summary judgment, the Court finds it unnecessary to rely on any diagnosis.

During her first week on the job, Plaintiff learned about company workplace policies and procedures. Dkt. 60 ¶ 2; Dkt. 48 at 110–11, 115, 117, 119; Dkt. 54. On January 8, 2022, in her second week of employment, Plaintiff completed training on Winn-Dixie's policy against discrimination and harassment. Dkt. 60 ¶ 3. The policy requires that associates (such as Plaintiff) who experience or observe discriminatory or harassing conduct "must report it immediately to a Human Resources Business Partner or the Associate Relations Support Hotline at [a 1-877 phone number]." Dkt. 60 ¶ 6.

In her second week, Plaintiff noticed Green constantly staring at her, which made her uncomfortable because of "the look he had on his face."[2] Dkt. 60 ¶¶ 2,

---

[2] Green's mother's declaration references her son's prolonged staring ("autistic gaze"), his inappropriate expression and body posture, and his making statements out of context. Dkt. 55.

11; Dkt. 48 at 183, 185, 187–88.  On at least five occasions while he was staring at her, Green would also lick his lips "all the way around" or sometimes just the top lip slowly.  Dkt. 48 at 188–89.

During Plaintiff's third week as a cashier, Green started following her to the back of the store.  Dkt. 60 ¶ 15; Dkt. 48 at 183, 189.  Plaintiff felt uncomfortable about three times when Green followed her to the back, where he would sometimes drink a Coke and sit down and watch her. Dkt. 60 ¶ 15; Dkt. 48 at 189–90.

Green also flicked his tongue at Plaintiff and, once, blew her a kiss.  Dkt. 60 ¶ 16; Dkt. 48 at 127, 192–93.  At the time, Plaintiff was in the money room in the back of the store with Ryan McNeil, who was counting the money.  Dkt. 48 at 132, 192.  Green walked by the room, and both Ms. McNeil and Plaintiff saw Green blow a kiss and McNeil said something to him.  Dkt. 48 at 135, 192–93, 239.  Plaintiff and McNeil shared stories about how Green was creepy, and Plaintiff told McNeil about Green's conduct and how it bothered her.  Dkt. 48 at 193, 239, 240.  Plaintiff knew McNeil was not a manager.  *Id.*[3]

It was not until the fourth week of employment that Green began making comments to Plaintiff that made her uncomfortable.  Dkt. 60 ¶ 17; Dkt. 48 at 191.  Green came into the store three different times on his days off while Plaintiff was

---

[3] Plaintiff sometimes perceived Ms. McNeil as a manager because she wore a different uniform and was "like [her] boss."  Dkt. 48 at 136.

working.  Dkt. 60 ¶ 18; Dkt. 48 at 236–37.  Plaintiff testified that on his third visit, Green made his first comment that made her uncomfortable—a comment about a wet milk carton.  Dkt. 60 ¶ 18; Dkt. 48 at 127, 129, 191.  Green was purchasing milk and Plaintiff, as cashier, asked if he wanted his milk in a bag.  Dkt. 48 at 154.  Green asked why, and Plaintiff responded, "Because it's wet."  *Id.* at 155.  Green then said, "Ooh, wet."  *Id.* at 155.  Plaintiff considers this comment the most egregious conduct.  *Id.* at 191.

Other comments made Plaintiff feel uncomfortable.  Green told her, in front of McNeil, that he rated Plaintiff as a 9 on a scale of 1 through 10.  Dkt. 60 ¶ 19; Dkt. 73 ¶ 19; Dkt. 48 at 191, 193.  On another occasion, Green said to Plaintiff, "Let me tap that a\*\*" or "Let me spank that a\*\*."  Dkt. 60 ¶ 19; Dkt. 48 at 192.  McNeil witnessed this.  *Id.*

Green also commented on how much he liked girls in general and girls with blue hair, especially Hispanic girls with "blue hair, crazy-color hair."  Dkt. 60 ¶ 19; Dkt. 48 at 192, 194.  Plaintiff had blue hair at the time.  Dkt. 48 at 192.  Plaintiff testified that he would mention that he liked girls about ten times a shift and that he liked girls with blue or crazy-colored hair five times total.  Dkt. 60 ¶ 19; Dkt. 48 at 194–95.  He also told Plaintiff that he had liked an underage girl (17) before.  Dkt. 60 ¶ 19; Dkt. 48 at 192.  Green told her that he was "obsessed with women and

God told me to be with women, so I want to be with a Hispanic girl."  Dkt. 60 ¶ 19; Dkt. 48 at 192.

On one occasion, Green touched Plaintiff's hair from the back, which made her uncomfortable, but she was not physically injured or harmed.  Dkt. 60 ¶ 14; Dkt. 73 ¶ 14; Dkt. 48 at 127, 202.  Plaintiff does not remember what Green said to her when he touched her hair.  Dkt. 48 at 125, 146–47.

It is undisputed that Plaintiff never reported Green's behavior to a Human Resources Business Partner ("HR") or the Associate Relations Support Hotline ("Support Hotline") pursuant to Winn-Dixie's harassment reported policy.  Dkt. 60 ¶ 21; Dkt. 73 ¶ 21; Dkt. 48 at 118.  No co-workers reported Green's behavior.

**February 5**

On February 5, 2022, Plaintiff was talking to a co-worker, Elizabeth Mandeville, about how Green's conduct made the co-worker feel uncomfortable. Dkt. 60 ¶ 22; Dkt. 73 ¶ 22; Dkt. 48 at 121, 156–57.  The two found Jamie Smith, a customer service associate, and they told Ms. Smith about Green's behavior.  Dkt. 60 ¶ 23; Dkt. 73 ¶ 23; Dkt. 48 at 119–22.  Smith then left the room to find Derek Harris.  Dkt. 60 ¶ 23; Dkt. 73 ¶ 23; Dkt. 48 at 120.  Mr. Harris was a "temporary evening" and "non-traditional" manager.  Dkt. 60 ¶ 23; Dkt. 73 ¶ 23; Dkt. 57 at 13; Dkt. 51 at 21–22; Dkt. 52 at 10–12.  That evening he was the acting non-traditional manager on duty.  Dkt. 60 ¶ 23.

6

For the first time, Plaintiff and co-worker Mandeville complained to Harris, about Green's conduct—touching her hair, flicking his tongue, making the "dirty joke" about milk, watching, staring, following her to the back room, and coming in on days off. Dkt. 60 ¶ 24; Dkt. 48 at 129–30. That night Harris texted and called the store merchandizing manager, Francis "Frankie" Prine about Plaintiff's complaint. Dkt. 60 25; Dkt. 48 at 130. Mr. Prine testified that he told Harris to get statements from Plaintiff and Green. Dkt. 51 at 15–17.

**Events after February 5**

Plaintiff worked on February 7, 9, and 10, which included a three-hour shift with Green on February 9. Dkt. 60 ¶ 27. Green did not bother Plaintiff during this shift. Her next scheduled shift was February 11, but Plaintiff did not report. *Id.* ¶ 28.

On February 11 while Plaintiff and her mother were shopping, Plaintiff asked her mother the difference between sexual harassment and sexual assault. Dkt. 50 at 23. Plaintiff then told her mother about Green's conduct. *Id.* at 23–24. At that point, Plaintiff and her mother drove to Winn-Dixie where her mother confronted mid-level managers and demanded Green's termination. *Id.* at 24; Dkt. 60 ¶ 28. Plaintiff's mother then called the Polk County Sheriff's Office because she "wanted something done" about Green making her daughter, a minor, feel uncomfortable at work. Dkt. 50 at 26, 32; Dkt. 60 ¶ 28.

The evening of February 11, a deputy sheriff responded to Winn-Dixie in reference to the incidents with Green. Dkt. 52-3 at 2. The deputy spoke with Plaintiff, her mother, Green, and a manager. *Id.* at 2–3. According to the sheriff's office incident report, Plaintiff told the deputy that her co-worker Green had begun to make her uncomfortable and she had started to dread going to work due to an incident. *Id.* at 2. Green had been playing with Plaintiff's hair while at work, attempting to make conversations sexual, and making a "motion" with his tongue to Plaintiff. *Id.* Plaintiff said that Green had told her that he likes another co-worker who is 17. *Id.* at 3.

When the deputy spoke with Green, he admitted playing with Plaintiff's hair but said he was only joking around and never tried to be inappropriate with her. *Id.* Green also stated that he was "unaware" of any "tongue gesture." *Id.* Corroborating what Plaintiff had told the deputy, Green said that he likes another co-worker, except she is over 18 (not 17), which management confirmed. *Id.*

After speaking with Green, the deputy returned to Plaintiff. *Id.* Plaintiff confirmed that Green never touched her inappropriately, other than to touch her hair. She further disclosed that Green would come into Winn-Dixie on his days off and check out at Plaintiff's register. He would give her a side eye that made her feel uncomfortable. She also stated that on his days off, Green followed her around while she was at work.

8

The deputy also spoke with Frenel Belchere, a customer service manager. Dkt. 52-3 at 3; Dkt. 51 at 27; Dkt. 66 at 4.  Mr. Belchere had no knowledge of what occurred on February 5 because he was on vacation from February 3 through 10.  Dkt. 66 at 6–7.  That night Belchere called HR because that was the first time he knew about any problems between Green and Plaintiff.  *Id.* at 7–8.  Mr. Prine, having received a text from Harris on February 5, was with Belchere during the deputy's interview.  *Id.* at 6, 7–9; Dkt. 51 at 10, 39.  The night of February 11, Prine emailed HR for the first time.  Dkt. 51 at 37; Dkt. 51-4.

The general store manager, Justin Hyder, knew nothing of any complaint made against Green until Plaintiff's mother came to the store on February 11.  Dkt. 57 at 8, 11, 16; Dkt. 66 at 4.  Mr. Hyder was not at the store that evening.  Dkt. 57 at 12.  Mr. Hyder testified that if a manager was told about the complaint on February 5, the manager should have reported it to him.  *Id.* at 20.  The two managers in the store were Prine and Belchere, and both reported to Hyder.  *Id.* at 33; Dkt. 51 at 12.  Prine was issued a final written warning over the complaint against Green, but it was not Hyder's decision to write him up.  Dkt. 57 at 37–38; Dkt. 51 at 52.  Belchere also received a final written warning.  Dkt. 57 at 39–41; Dkt. 66 at 10.  Belchere had never received any type of disciplinary action in his 31 years of employment with Winn-Dixie.  Dkt. 66 at 11.

**Investigation and Plaintiff's resignation**

9

On February 12, Winn-Dixie initiated an investigation into Plaintiff's complaint, and Green was placed on leave pending the investigation. Dkt. 60 ¶ 30. Given the option to either return to work or take paid leave, Plaintiff chose paid leave. *Id.*; Dkt. 48 at 165, 167–68.

During the investigation, Winn-Dixie interviewed Green, Plaintiff, Prine, Harris, Smith, Belchere, Natalie Gabzra (another cashier), and McNeil.[4] Dkt. 60 ¶¶ 31, 32, 33. Green was terminated on March 9, 2022. *Id.* ¶ 34. Winn-Dixie invited Plaintiff to return to work, but she resigned as of March 14, 2022. *Id.* ¶¶ 35, 36. Plaintiff's reasons for resignation were her experience with Green, the possibility of Green visiting the store, and a dispute with co-worker Smith over whether Plaintiff had told Smith not to tell Plaintiff's mother about Green. *Id.* ¶ 37; Dkt. 48 at 175–76, 196.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if 1) there is no genuine dispute as to any material fact and 2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it may "affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

[4] Natalie Gabzra was a cashier. Dkt. 53 at 40; Dkt. 53-4 at 3.

The moving party bears the initial burden of identifying those portions of the record that show the lack of genuinely disputed issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the nonmoving party to present "'affirmative evidence' that would allow a reasonable jury to rule for him." *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting *Anderson*, 477 U.S. at 257). It is not enough that "the jury might, and legally could, disbelieve the moving party's evidence." *Id*. at 1115–16 (citation and internal quotation marks omitted).

The court may not weigh conflicting evidence to resolve factual disputes. *Anderson*, 477 U.S. at 249. Nor may the court make credibility determinations at summary judgment, even if the court doubts the veracity of one party's evidence. *Feliciano v. City of Miami Bch.*, 707 F.3d 1244, 1252 (11th Cir. 2013).

The court must draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021). An inference is reasonable if it is not based on pure conjecture and speculation. *Hinson*, 927 F.3d at 1115 (citation omitted). If a party attempts to create an issue of fact through a sworn statement, that statement may "be disregarded if it 'flatly contradict[s]' earlier deposition testimony without explanation." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (quoting *Tippens v. Celotex Corp.*, 805 F.2d

11

949, 953 (11th Cir. 1986)).  There is a distinction, however, between discrepancies "which create transparent shams" and those "which create an issue of credibility or go to the weight of the evidence."  *Id*. (citation modified).

## DISCUSSION

Defendant argues first that Green's conduct was not sufficiently severe or pervasive to alter Plaintiff's employment conditions.  Second, Defendant asserts that Plaintiff failed to use the established reporting procedure to report any harassment and therefore lacked notice of the harassment.  Even assuming Plaintiff gave proper notice, Defendant claims it acted promptly and effectively when notified.  Third, Plaintiff's resignation was not compelled by intolerable conditions.

### **Hostile Work Environment**

Counts I and II allege hostile work environment claims in violation of Title VII and the FCRA.  "[D]ecisions construing Title VII apply to the analysis of FCRA claims."  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387, 1389–90 (11th Cir. 1998)).  Title VII forbids "requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To establish a hostile work environment based on sexual harassment, an employee must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Thomas v. Seminole Elec. Cooperative, Inc.*, 385 F. Supp. 3d 1246, 1259 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).[5]  An offensive comment at work does not automatically qualify as a hostile work environment.  *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*) ("Title VII is not a civility code.").

### *Severe or Pervasive Harassment*

Plaintiff did not welcome the gestures and comments from Green, which took place while she was at work.  Plaintiff must show, however, that her workplace was so "permeated with discriminatory intimidation, ridicule, and insult" to be sufficiently severe or pervasive such that it altered conditions of employment and created an abusive working environment.  *Harris*, 510 U.S. at 21

---

[5] *See also Santana v. Telemundo Network Grp., LLC*, No. 22-13879, 2026 WL 180272, at * 11 (11th Cir. Jan. 22, 2026) (reversing summary judgment on sexual hostile work environment and citing *Miller*).

(citation modified) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  This factor possesses both an objective and a subjective component.  *Adams v. Austal, U.S.A., L.L.C.*, 754 F. 3d 1240, 1249 (11th Cir. 2014) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*)).  Plaintiff must show that she subjectively perceived the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment.  *Adams*, 754 F.3d at 1249.

Objectivity, on the other hand, is assessed from the perspective of a reasonable person in the plaintiff's position, "knowing what the plaintiff knew." *Adams*, 754 F.3d at 1250.  In objectively evaluating the allegedly harassing conduct, the Court considers all the circumstances, including "frequency; severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reeves*, 594 F.3d at 808–09 (citation modified) (quoting *Harris*, 510 US. at 23).

Plaintiff has shown she subjectively perceived Green's behavior as sexually harassing.  The Court accepts that Plaintiff was 16 and felt uncomfortable due to Green's prolonged, awkward stares and lip-licking, which she perceived as "creepy."[6]  Although there is no evidence presented that during Plaintiff's

---

[6] Defendant urges this Court to view Plaintiff's videotaped deposition and determine from Plaintiff's facial gestures, mimicking Green's, that Green's facial expressions were non-sexual. Dkt. 59 at 5–6.  The Court refrains from doing so as it may involve an improper evidentiary

14

employment she could not or did not perform as expected as required in *Mendoza*, 195 F.3d at 1248, Plaintiff did not show up for her last shift on February 11 to avoid seeing Green.[7]

### *Objective Test*

Turning to the objective test, the Court looks at the conduct under the four-factor test—frequency, severity, humiliation, and interference with work performance—as viewed from the perspective of a reasonable person. In doing so, the Court looks generally to case law construing the severity or pervasiveness necessary to create a sexually hostile work environment.[8] There is no "magic number" of incidents of verbal harassment that is required. *See Miller*, 277 F.3d at 1276. The circumstances must be considered in their totality, not any single factor

---

finding at summary judgment of whether Plaintiff's re-creation of Green's lip-licking and tongue-flicking establishes proof of the absence of sexual implication. Gestures such as these can be interpreted differently depending on the recipient and the context. In any event, Plaintiff found the stares uncomfortable and creepy. Because Plaintiff does not concede that Green suffered from autism, the Court does not resolve a factual dispute of whether the behavior resulted from autism, Green's desire to date Plaintiff, or some combination of both.

[7] As further evidence of her subjective beliefs, Plaintiff adds that after she resigned, she suffered anxiety, sought therapy, and became uncomfortable around men. *See* Dkt. 72 at 14. Plaintiff's family witnessed her change in dress and behavior, wearing baggy clothes, no make-up, and confining herself to her room. *Id.*

[8] Since the filing of the pending motion, the Eleventh Circuit issued *Melton v. I-10 Truck Ctr., Inc.*, No. 23-14175, 2026 WL 319183 (11th Cir. Feb. 6, 2026). *Melton* involved a race-based hostile work environment claim and the majority discussed the applicable law for both sex-and-race based harassment. In another recent, although unpublished, case, the Eleventh Circuit reversed the grant of summary judgment in a sexually hostile work environment claim. *Santana v. Telemundo Network Group, LLC*, No. 22-13879, 2026 WL 180272 (11th Cir. Jan. 22, 2026). *Santana* is factually distinguishable. There, the challenged conduct encompassed repetitive sexually explicit comments, unwanted physical contact, encroachment upon the plaintiff's personal space, and the perpetrator putting his arm around the plaintiff's waist and grazing her leg, all which lasted for years and continued after the plaintiff complained. *Id.* at *12.

is dispositive. *Jones v. UPS Gound Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) (citing *Harris*, 510 U.S. at 23).

*Frequency*

As to first factor, frequency, Green stared at Plaintiff about twice per shift, and she worked about eight part-time shifts with Green. On five occasions when he stared at her, he would lick his lips either "all the way around" or only his top lip slowly. In the third week, Green began to follow Plaintiff to the back of the store where breaks or work-related tasks, such as counting money, took place. He followed her without speaking about three times. He would sit down with a Coke and watch her, or "flick" his tongue at her, and once, he blew her a kiss as he walked by. When he blew the kiss, co-worker Ms. NcNeil saw it and said something to Green about stopping it. McNeil was not a manager, though, and neither Plaintiff nor McNeil complained to a manager or HR about Green's behavior at this point. Although Plaintiff learned that some of her co-workers agreed that Green was "creepy," none of them ever complained, and no one articulated what "weird" and "creepy" meant.[9]

---

[9] Plaintiff testified at her deposition that one co-worker compared Green's stare to "a crazy serial killer." Dkt. 48 at 180. Another told Plaintiff that Green kept trying to get her to go on a date with him. *Id.* at 181. Another told Plaintiff that he used to ask to drive the co-worker home. *Id.* at 182.

16

In Plaintiff's fourth week on the job, Green began making comments to her, which made her uncomfortable. Green would tell Plaintiff how much he liked girls, especially Hispanic girls with blue or crazy-colored hair. This occurred a total of five times. He once told her in front of co-worker McNeil that he rated Plaintiff as a 9 on a 10-point scale. Another time, Green said to her in front of McNeil, "Let me tap that a\*\*'" or "spank that a\*\*." Again, none of this was reported by Plaintiff or McNeil to HR or a manager, and no one else witnessed any of this behavior.

The most disturbing comment was the "wet milk" comment that Green made to Plaintiff when he came into the store to shop on his day off. Green's response to Plaintiff as he purchased milk ("Ooh, wet") could be construed with or without sexual innuendo. The only remotely physical contact was the one instance when Green touched Plaintiff's hair from the back. Plaintiff does not remember what Green said to her when he did so, and she was not injured.

Plaintiff contends that Green's conduct was frequent, and therefore pervasive, based on her brief employment of about four to five weeks. Dkt. 72 at 15. Plaintiff counts 13 occurrences over four weeks and relies on *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 509 (2000). *Johnson*, a sexual harassment case, concludes that fifteen separate occurrences of harassment to a female employee within a four-month period is "not infrequent."

17

*Id.* at 509. The fifteen occurrences included "unwanted massages," standing close enough for the male perpetrator's body parts to "touch[] her from behind," and pulling his pants tightly "to reveal the imprint of his private parts." *Id. Johnson* also contrasted other cases "where there were fewer instances of less objectional conduct over longer periods of time." *Id.* The Eleventh Circuit cases have found that "more than 10 specific" instances of discriminatory remarks against the employee's national origin made in a two-month period is "frequent." *See Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 776 (11th Cir. 2024) (citing *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020)). Another case, which addressed a sexually hostile work environment, found "far too infrequent" the five instances, including a slight physical contact once, an inappropriate statement once, and three instances of a sniffing sound, over an 11-month period. *See Copeland*, 97 F.4th at 776 (citing *Mendoza*, 195 F.3d at 1249).

Defendant cites several cases where summary judgment for the employer was upheld on appeal, for far more egregious behavior than here. *See* Dkt. 59 at 8–10; *see, e.g., Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 578–79 (11th Cir. 2000). Notably, the acts of following and staring, even if frequent, have been found insufficient as a matter of law to sustain a hostile work environment claim. *See Mendoza*, 195 F.3d at 1249–52; *Gupta*, 212 F.3d at 584–85. In tallying the

18

number of occasions, *Mendoza* did not count the "constant following and staring" as specific instances of harassment.  195 F.3d at 1249.

Viewed in the light most favorable to Plaintiff, the Court considers the milk comment and the comment about spanking as separate and distinct instances in a frequency calculation.  The following and staring, although considered in the totality of the circumstances, are not specific instances to be tallied in the frequency count, as found by *Mendoza* and *Gupta*.  Likewise, the five times Green licked his lips while staring may or may not have sexual implications.  The comments about how Green liked girls who looked like Plaintiff, while flirtatious, do not invoke any improper sexual connotation.  Even if the lip-licking gestures, dirty milk joke, spanking comment, and attractiveness rating scale, qualified as frequent, Green's conduct does not satisfy the remaining three factors: severity, or physically threatening or humiliating, or interfering with job performance.

*Severity*

In determining severity, it is more difficult to show harassment when it does not involve a supervisor.  *See Copeland*, 97 F.4th at 777 ("Harassment is also more severe when it involves the participation of supervisors rather than solely peer or subordinates.").  Green was a co-worker.  Neither Plaintiff, nor her co-workers who also felt uncomfortable around Green, complained to HR or a manager—at

19

least not before February 5 when Plaintiff and co-worker Mandeville complained to Harris, the manager on duty.

Plaintiff argues that Plaintiff's young age is a paramount factor due to the vulnerability of minors and the severity of the sexual misconduct depending on the context, and cites *Jones v. Haristoy, Inc.*, No. 3:03-cv-121-JTC, 2005 WL 8153062 (N.D. Ga. Feb. 11, 2005). *Jones* involved a restaurant manager who was twice the age of most of the plaintiffs. The manager, who owned the restaurants, made lewd and sexual comments and advances daily, including brushing against the plaintiffs and grabbing their buttocks, trying to put his tongue in their ears, physically humiliating them in front of customers, and touching them inappropriately multiple times each day. Their youth, relative age to the manager, and need for their jobs increased their vulnerability, which the court considered in the totality of the evidence.

Even accepting Plaintiff's age as a vulnerability factor in the totality of the circumstances, the Court finds that Green's conduct does not compare to that of the manager in *Jones*. Here, there is little age discrepancy (four years) between Plaintiff and Green. Green told Plaintiff that he liked girls who met Plaintiff's description: younger, Hispanic, and girls with blue or crazy-colored hair. These comments convey that he was attracted to Plaintiff but do not necessary mean that he wanted a physical, sexual relationship.

20

Green sometimes followed Plaintiff to the back of the store and stared at Plaintiff several times per shift.  As noted above, there is nothing inherently sexual about staring and following.  Green did touch Plaintiff (her hair) once, but she could not remember what he said.  Green never touched her in an obviously sexually offensive manner.  Rating physical attractiveness on a 10-point scale can be interpreted by some as demeaning because the practice objectifies the body and may negatively affect self-worth or dignity.  Others may find it complimentary, depending on the context.  While Plaintiff did not welcome any comments from Green, a single ranking does not transform the workplace to a sexually hostile one.

Finally, in Plaintiff's eyes, the worst verbal comment made was the comment about milk.  No doubt the comment was inappropriate because it could easily be construed as sexual innuendo.  Observing all instances as a whole, however, the Court finds that the comments, gestures, stares, following, and the one-time hair touching do not lead to the inescapable conclusion that a reasonable jury could find that Green's comments and conduct, whether explicitly or implicitly sexual in nature, were so frequent, grotesque and appalling, or physically threatening or humiliating to create a sexually hostile environment.  The milk joke, physical attractiveness rating, and spanking comments are insufficient alone, or

21

collectively, and fall short of the seriousness necessary to create a hostile workplace.[10]

### *Physically threatened/humiliated*

Regarding the remaining factors, Plaintiff was not physically threatened or humiliated in front of others. Green stared, followed, lip-licked, ranked her looks, blew a kiss once, and touched her hair once, but this conduct cannot be said to be in any way physically threatening or especially humiliating in an objective sense.

### *Interference*

Plaintiff performed her job without flaw and hence, without interference. After Plaintiff finally complained to Mr. Harris, who was deemed the manager on duty on February 5, she worked one more shift with Green—a three-hour shift on February 9. Plaintiff presents no evidence that Green stared, gestured, or commented during the February 9 shift. She admits that he did not stare after she complained. Dkt. 60 ¶ 11. On February 11, after Plaintiff's mother became aware of her daughter's work situation, HR was finally notified, an investigation began, and Green was placed on leave.

Considering all four factors of the objective test and viewing all the circumstances in the light most favorable to Plaintiff, the Court concludes that no

---

[10] An isolated or single incident must be "grave enough" or "extremely serious" to designate a work environment hostile. *Mayhew v. Med. Data Sys., Inc.*, No. 6:25-cv-320-JSS-DCI, 2026 WL 191969, at *6 (M.D. Fla. Jan. 23, 2026) (collecting cases, including *Gupta* and *Adams*).

genuine issues of material fact exist sufficient for this case to proceed to jury.  In other words, a reasonable jury could not find co-worker Green created an environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to be deemed hostile.  *See Miller*, 277 F.3d at 1275 (quoting *Harris*, 510 U.S. at 21).[11]

The Court acknowledges that, viewed in Plaintiff's favor, this is a close call and others may differ.  But as discussed below, even if Green's behavior was sufficiently severe and pervasive to proceed to a jury, there is no basis for holding Winn-Dixie liable.  As noted, Plaintiff dropped her case against Green after being provided with his autism diagnosis.

## Employer Liability

The parties do not agree on the applicable law for employer liability when the alleged harasser is a co-worker versus a supervisor.  The Supreme Court has addressed the distinction:

> Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer

---

[11] The Eleventh Circuit has "not applied the three traditional frameworks—direct evidence, *McDonnell Douglas*, and "convincing mosaic"—to hostile-work-environment claims." *Harris v. Public Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1304 n.5 (11th Cir. 2023).  Thus, a convincing mosaic analysis does not apply to a purely hostile work environment action.  Even if it did, the Court finds that no mosaic is presented to convincingly create any questions for a jury.

is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. [*Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).] Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim[.]

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *see also Santana v. Telemundo Network Grp., LLC*, No. 22-13879, 2026 WL 180272, at *14 (11th Cir. Jan. 22, 2026) (citing *Vance*) (unpublished order). Under *Vance* and Eleventh Circuit precedent, the lesser negligence standard applies to non-supervisory harassers. *See Miller*, 277 F.3d at 1275 (holding employer is liable for co-employee harassment only if it "knew or should have known of the harassing conduct but failed to take remedial action"); *Johnson*, 234 F.3d at 510 (holding that employer is liable for co-worker harassment only if it "knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action" and quoting *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)); *Santana,* 2026 WL 180272, at *14 (citing *Breda*).

All agree that Green, the alleged harasser, is a co-worker with no authority to take tangible employment action against Plaintiff. He was a part-time bagger

24

and cart fetcher.  Thus, Winn-Dixie is directly liable only if it was negligent in controlling working conditions—did it have actual or constructive notice of the harassment and fail to promptly take remedial measures.  *Id.*  A company's anti-harassment policy is considered in determining notice in co-worker harassment cases.  *See Breda*, 222 F.3d at 889–890.  As will be discussed, a reasonable policy establishes what constitutes actual notice.

A reasonable policy must be effectively disseminated to employees, and the employees must follow the procedures established by the company.  *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298–99 (11th Cir. 2000); *see also Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 582 (11th Cir. 2007) (citing *Madray*).  Although *Madray* and *Minix* are supervisor harassment cases, a company's anti-harassment policy is still considered in co-worker harassment cases to establish actual notice—an employee must report harassment to someone with authority under the company policy.  *Breda*, 222 F.3d at 889–90.  "Through its policy, the employer has given the designated person explicit actual authority to handle the complaints . . . his or her actual authority already has been established through the terms of the employer's policy."  *Id.*  "The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy."  *Id.* at 890.  It is not necessary to "delve into the internal policies of the company to determine whether the person to

25

whom the complaints of harassment were made had the apparent authority to

respond to such complaints." *Id.*

Winn-Dixie has an anti-harassment policy, which Plaintiff admits she was

aware of by the beginning of her second week.  Dkt. 60 ¶¶ 2, 3.  The pertinent

policy provision applicable to both associates and managers provides in full:

> **Reporting Discrimination or Harassment**
> Because many forms of discrimination or harassment can be subtle, do
> not assume the Company is aware of a potential problem. If you believe
> you have experienced or observed discriminatory or harassing conduct,
> then *you must report it immediately to your Human Resources Business
> Partner or call the Company's Associate Relations Support Hotline at
> 1-877-919-3425*. Even if you are unsure whether certain conduct is
> discriminatory or harassing, we still strongly encourage you to err on
> the side of caution and to report the conduct before a manageable
> situation becomes a bigger problem. *Managers who are notified of
> potential or actual harassing conduct—either through personal
> observation or an associate's complaint—should notify the designated
> personnel listed above immediately*, even if a reporting associate asks
> that the incident be kept confidential or that no action be taken.

Dkt. 60 ¶ 6; Dkt. 54-3 at 17 (emphasis added); Dkt. 52-1 at 19 (emphasis added);

Dkt. 73 ¶ 55; Dkt. 48-12 at 2.  Plaintiff never contacted HR or called the hotline.

None of her co-workers ever contacted HR or called the hotline.

Plaintiff admits she was unaware whether any of her co-workers (Gabzra,

Smith, Mandeville, and McNeil) ever complained to anyone at Winn-Dixie about

Green, and Winn-Dixie confirms it did not receive any complaints about Green.

Even though, according to Plaintiff, a co-worker (McNeil) witnessed Green

blowing a kiss, rating her attractiveness, and making the "spank" comment, there is

no evidence that Green's conduct was noticeable to any supervisor, manager, or other co-worker.  Before February 5, no one above the "associate" level was told about or observed Green's conduct.  Plaintiff did not follow the employee handbook and report Green's behavior to the personnel listed in the policy, and this fact alone forecloses a finding of actual notice and liability.

Assuming it does not foreclose liability, the Court considers the events of February 5, 2022.  Plaintiff was talking with co-worker Mandeville about Green and together, Plaintiff and Mandeville, reached out to co-worker Smith.  Smith then sought and found Harris, who was the "manager on duty" that evening. According to Winn-Dixie, Mr. Harris was at most a "non-traditional" and "sometimes temporary" manager.

The published policy provision applicable to managers provides in full:

**Responsibilities**
Managers are responsible for communicating, explaining and ensuring compliance with all aspects of our policies against unlawful harassment and discrimination. Managers are obligated to immediately investigate any harassment claim or act of discrimination by a present or prospective associate and *to contact their Manager and Human Resources Generalist immediately.* Additionally, any time harassment or discrimination is observed, management must immediately take action *by contacting their manager and Human Resources Generalist.* When an associate is found to have engaged in unlawful harassment or discrimination, appropriate disciplinary action will be taken, up to and including termination.

Dkt. 60 ¶ 6; Dkt. 54-3 at 17 (emphasis added); Dkt. 52-1 at 19 (emphasis added).

As soon as Harris was informed on February 5, he texted Prine, the store

merchandizing manager.  Harris did not contact the Human Resources Generalist but did text Prine, his manager.

Harris left on vacation the next day, February 6, and Belchere, the customer service manager, was on vacation from February 3 through 10.  Both Prine and Belchere were managers who reported to Mr. Hyder—the general store manager.  Either Harris or Prine was supposed to get statements from Plaintiff and Green but did not get them prior to February 11 when Plaintiff's mother showed up at the store and the sheriff's department was called.  The personnel identified in the policy were not contacted by Prine, Harris, Belchere, or Plaintiff.  Hyder and HR were not notified until February 11.  Both Prine and Belchere were disciplined for their failures to follow the policy and report to HR, and Hyder approved of the discipline.

Assuming Winn-Dixie had actual or constructive notice of Green's behavior on February 5, the Court finds that Winn-Dixie took prompt, remedial action by immediately placing Green on leave six days later.  The action occurred less than one week after a manager on duty became aware of the situation.  As admitted by Plaintiff, Green did not stare or make any harassing comment on the one three-hour shift she worked with Green in the interim.  No harassment happened after the earliest possible date of Winn-Dixie's notice.  That Plaintiff's mother initiated a sheriff's visit does not negate a finding that Winn-Dixie acted promptly—within

28

one week from Harris and Prine's awareness—and immediately on February 11 by placing Green on leave while a full investigation was conducted. Moreover, the deputy sheriff found no reason to arrest Green.

Had a proper complaint to HR been made earlier than February 11, HR would have first spoken with the associate complainant, obtained names of any witnesses, and began a full-fledged investigation. Dkt. 53 at 16–17, 51. The investigation beginning February 11 revealed that co-workers Gabzra, Smith, Mandeville, and McNeil never complained to a manager or HR, or called the special hotline to report Green. All stated that Green had the "creepy" stare.[12]

When Green was placed on leave, Plaintiff was offered to continue working or to take paid leave. She chose the latter. After the investigation, Green was terminated, and thereafter Plaintiff voluntarily resigned. Although Plaintiff argues that something could have happened between February 5 and 11, it did not. In fact, Plaintiff admits Green did not bother her after February 5.

Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has failed to demonstrate a sexually hostile work environment.

---

[12] The record shows that at some point, Plaintiff discussed Green with some co-workers—McNeil, Mandeville, and Rena Newton—and they agreed that Green was "creepy." Dkt. 48 at 133, 135–36, 178–82; Dkt. 68-2. The record, however, does not substantiate that these discussions occurred before the February 11 investigation.

Even assuming the environment were hostile, Winn-Dixie can be liable for Green's conduct only if it knew or should have known of the harassing conduct but failed to take prompt remedial action.  Winn-Dixie was not negligent because it disseminated a reasonable anti-harassment policy, which Plaintiff failed to follow, and it immediately placed Green on leave after the designated personnel were made aware of the circumstances.

Accordingly, Defendant's motion for summary judgment (Dkt. 59) is granted on Counts I, II, III, IV, V, and VI of the complaint, and no other counts remain pending.  The Clerk is directed to enter final summary judgment in favor of Defendant Southeastern Grocers, Inc. d/b/a Winn-Dixie and against Plaintiff Hennessey Colon.  The Clerk is directed to terminate all pending motions and deadlines and to close the case.

**DONE AND ORDERED** at Tampa, Florida, on February 18, 2026.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO:**
Counsel of Record